Oyez, oyez, all persons having business with the honorable United States Court of Appeals for the Third Circuit are admonished to draw near and give their attention for this court is now in session. God save the United States and its honorable court. Please be seated. Good morning, everyone. The first case is CBS Corporation v. FCC. Mr. Robert Korn Revere, are you ready to proceed? Good. We're giving both counsel five minutes of uninterrupted argument and then we'll jump in. May it please the court. With the court's permission, I would reserve five minutes of my time for rebuttal. The FCC's decision to fine CBS Broadcasting $550,000 for the 916th of a second that ended the 2004 Super Bowl halftime show. Could you speak up just a little bit or move the microphone? Yes. I'll start over. The FCC's decision to fine CBS Broadcasting $550,000 for the 916th of a second that ended the 2004 Super Bowl halftime show was wrong for at least four reasons. First, the decision is invalid because the FCC imposed liability despite the fact that CBS neither planned nor approved the split-second incident. Quite to the contrary, the undisputed record in this case shows that CBS had no advanced knowledge that the stunt concocted at the last minute by Janet Jackson and Justin Timberlake would occur. Unable to come up with evidence of network complicity, the FCC has attempted to minimize its burden of proof or to dispense with it altogether by manipulating applicable legal standards. It applies an inappropriate statutory standard of willfulness and incorrectly relies on the common law agency doctrine of respondeat superior. However, these arguments are foreclosed by basic principles of statutory construction, including the requirement that the law must be interpreted to avoid an unconstitutional result such as eliminating the need to show scienter. In addition, the Supreme Court has held that respondeat superior cannot be used to support punitive sanctions where, as here, there has been a good-faith attempt to comply with federal mandates. In this case, the record shows that CBS selected performers specifically to minimize the possibility of unforeseen events. It carefully reviewed the script and subjected the broadcast to what was then the industry standard five-second delay. When these actions proved insufficient to prevent the unexpected event, CBS immediately apologized to its audience. But this reflected the fact that CBS did not meet its own editorial standards and does not constitute an acknowledgment that the broadcast should be legally sanctioned. The FCC's zero-tolerance approach applied in this case is invalid and has had a significant chilling effect on the broadcast industry, particularly with respect to live programming. Second, the FCC's decision should be reversed for the same reasons as were articulated recently by the Second Circuit in Fox television stations versus the FCC. Here, the Commission has not even attempted to justify abandoning the restrained indecency enforcement policy that the agency articulated and applied for almost 30 years. When the FCC and the courts first articulated an indecency standard in the mid-1970s, they confronted a paradox. The legal standard they devised was less precise than the test for obscenity, even though indecent speech, unlike obscenity, is fully protected by the First Amendment. So the Commission and the courts created two safeguards as part of the restrained enforcement policy as an attempt to establish, insofar as possible, bright lines and to minimize any chilling effect of applying the indecency rules. First, they held that the FCC could not impose a complete ban on indecent speech despite the categorical language of 18 U.S.C. section 1464. Instead, they imposed the so-called safe harbor of time channeling. And secondly, they applied a consistent policy whereby unintended, inadvertent, or fleeting transmissions were considered to be non-actionable. In this case, the Commission abandoned the second of these two bright-line tests without any explanation whatsoever. At a minimum, the decision violates the Administrative Procedure Act, and it also undermines the First Amendment balance that was articulated in Pacifica and subsequent cases. Third, the decision violates due process because the FCC applied its fundamental change in policy retroactively to CBS. In every other case where the FCC has altered its indecency enforcement policy, it has recognized that it cannot at the same time impose a forfeiture. Its decision to do so here cannot be reconciled with those prior decisions and violates basic principles of due process. And fourth, the FCC's application of its indecency policy to the Super Bowl broadcast was arbitrary and capricious. The FCC purports to base its findings in indecency cases on contemporary community standards for the broadcast industry, and yet readily admits it has absolutely no measure and does not attempt to measure what those are. By way of proxy, the FCC has announced three contextual factors that it purports to use to measure whether a particular broadcast is patently offensive. But the FCC's ability to manipulate those factors shows them to be entirely malleable and therefore arbitrary. Its reasoning in this case ignores the critical contextual factors that the Supreme Court and the Commission consider an FCC versus Pacifica foundation. Let's interrupt you at this point. There are many interesting and difficult issues involving administrative and constitutional law in this case. But let me zero in for a moment on the video delay. And would I be incorrect in saying that these kinds of events are going to be unlikely in the future? That is, we're not going to see too many of these kinds of cases with the technology now that can be implemented with video delay. And then you might talk, while we're on that topic, you might talk a little bit about what the record shows about the availability of video delay at the time of the broadcast. Yes, Judge Serka, if I could take the second part of that question first.  That's fine. The record shows that video delay simply did not exist. It didn't exist for the simple fact that this event was unprecedented in the history of broadcast television. That's why there had been a five-second audio delay because the concern had always been about language. There had never been a performer going off script and having this kind of incident. And it's your position that the warning signs that existed were focused on words and not on images. Well, I think the warning signs that the Commission has tried to point to in the decisions below are exaggerated. And I can talk about those specifically. But the video delay had to be invented after the Super Bowl. It simply did not exist before because of that. But it was invented pretty quickly after that time, wasn't it? Within a week, that's true. It wasn't a technical, complex thing necessarily, but it did require a lot of attention. It's not an easy thing to do programmatically in a given show. But it simply had never been done before, and it was invented after the Super Bowl. But it means that this incident would not occur again. Well, that's right. It does mean that in shows of this type, video delays are more routinely used. Although there are programs where there wouldn't be, like in this case, a five-minute delay, like news programs where something like this could happen where you would not have a video delay that you could rely on. Nevertheless, the standard that the FCC has articulated in this case and applied elsewhere would suggest that even those shows are in jeopardy. Any time there is a live presentation, the broadcaster is at risk, whether or not they intended to broadcast something that the FCC later concludes violates the indecency standards. Now, what did the FCC say about the video delay situation? Why were they wrong? Well, the FCC says that we should have used a video delay in advance, even though there had never been an occurrence like this, and even though the video delay did not exist. It's purely 20-20 hindsight. So to apply that standard now to a finding of liability for CBS then, before these events occurred, I think is unreasonable. Am I correct? Just one thing. Am I correct that the record does not say anything about the availability of video delay at the time of the broadcast? That is, it doesn't say that the technology was available? No, no. Nothing in the record says it was. In fact, in CBS's response to the FCC's letter of inquiry, CBS explained that there had not been a video delay before and that it was developed after the Super Bowl for the Grammy Awards ceremony. Now you say developed. Are you saying there was no technology and the record shows there was no technology, or is the record silent as to the availability? It is explained in the response to the FCC that no video delay had ever been developed before and that it had to be developed for the Grammy Awards. And so who had the burden of showing that it was available, in your view? Well, it's more than just a question of whether or not it's available. It's whether or not the level of micromanagement that the FCC is trying to impose in this case is supportable under the law. That's a different question. But with respect to its availability at the time, I assume it's your position that the FCC had the burden. Well, it's the FCC that's bringing the case and has the burden to show that CBS has violated the indecency standards. So certainly it would be the Commission's burden to show that there was a video delay that existed and that CBS should have known and should have used. But again, the standard of knowledge that has been approved for FCC decisions in the past in a case that the FCC cites in the forfeiture order, Yale Broadcasting versus the FCC, doesn't go nearly so far. It says that broadcasters need to make reasonable efforts to determine what's going to be on, but they don't have to settle every conceivable ambiguity and answer every question. And in fact, the Yale Broadcasting case dealt with knowing what was on sound recordings before they were put on the radio. And the D.C. Circuit in that case went on to say that the standard would be different for a live broadcast when you could not expect the broadcaster to reasonably anticipate what might happen in the live setting. What if this had been prerecorded and then shown? Would your argument be different? I think it would be different, simply because that's one of the factors that the Supreme Court and the FCC focused on in the Pacifica case. There, as I was about to mention earlier, the critical contextual factors that the Court identified and that the FCC applied for 30 years were three. They looked at whether or not the image or the program was prerecorded, whether or not it contained offensive language that was broadcast over and over again, and whether or not it was intentional. Those are the three critical factors that the Court was concerned about in Pacifica and that the FCC has ignored in this case. So would the fines be justified in that event? It would be a finer distinction in that case. You would have a factor that doesn't exist in that case. I don't know if I can answer the question if it was known in advance what was going to happen, but the fact is here the FCC specifically said in its orders that it does not matter that CBS didn't know it was going to happen. They said it does not matter whether or not the network intended to broadcast nudity. Does it matter if we're under sub B or sub D in terms of the willfulness or knowing? Because 1464 has a knowing standard that would be implicated if we're under subsection 1D versus 1B. Does it matter? Well, that's right. The proper statutory section to apply here is section 503B1D since that specifies a violation of section 1464. As a matter of fact, for purposes of forfeiture statute, subsection D relates to those sections of the Communications Act that deal with regulating content. The FCC tries to adopt a lower standard by relying on section 503B1B, which relies to general provisions of the Communications Act and general provisions of the FCC's rules. The more specific statutory provision is the one that controls based on just normal rules of statutory construction. Does that have a knowingly standard as compared to a willfully standard? Well, yeah, it would be scienter where you would have to have some knowledge. Well, how would you define that? Well, I'm sorry. Maybe you are defining it. I think as it seems in your brief, you seem to want the FCC to meet a very high burden here. Well, I think the case... Pardon me for interrupting. I think the case law does make it clear where you're regulating expressive activity that there is a high standard, that it has to be either reckless disregard or actual knowledge that the event was going to occur, whereas here on this record, it's quite clear that CBS had no actual knowledge, and the FCC's position is that it didn't need to know, and it's irrelevant whether or not CBS intended to do that. Couldn't it be said that you failed to take reasonable precautions to find out what was going to take place? No, I think the record is quite clear here that CBS did take reasonable precautions. It not only excluded certain performers that it thought might not adhere to broadcast standard, but it selected these performers because it reasonably believed that they would understand and adhere to broadcast standards. Go ahead. It reviewed the script and had program practices go over the script, including both the scripted portions and expressed concern for any parts that might be ad-libbed. They did apply the five-second delay. There was no reason to believe that CBS didn't apply the reasonable standards that any broadcaster would for a live broadcast. Can you have a reasonable precaution standard that does not conflict with the First Amendment scientific standard? I'm going to state it again. I'm not sure that I understood the question. The reasonable precaution standard, can you have a reasonable precaution standard that doesn't conflict with the First Amendment scientific standard? Well, I think the reasonable precautions that CBS took even satisfy the FCC standard for what a broadcaster needs to have done. I think here where the record does show that there was absolutely no knowledge, that the FCC also failed to meet a First Amendment scientific standard. Let's see if we can define the standard. I gather what you're saying is that willfulness can be met either by knowledge or by reckless conduct. Is that correct? I think that is correct. All right, so then if you acted with either gross negligence or with recklessness, you could be held liable. I think that's the standard that's recognized even in defamation cases, so yes. I'm surprised you would say that. I thought we were talking about conscious and deliberate actions or omissions. I think at a minimum you would have to have reckless disregard, but I think here where the record has shown that CBS had no knowledge and no intent, that that is the more appropriate standard, but it has been recognized. How do we make a statement, Appendix 168, where someone is saying, I don't want to go so far that I have a dozen of my owners complaining to me about what Janet Jackson was wearing or not wearing on stage at halftime. I wouldn't know Janet Jackson if she walked in my office, but I do know, et cetera, et cetera. There was some contemplation of potential problems, was there not? That particular reference in the record, Page 168, is a memo from Paul Tagliabue to Les Moonves of CBS, and it was done at the outset of the process. What's interesting about that is that it was expressing general concerns that arose not from Janet Jackson, but from an earlier incident whereby the NFL had been embarrassed by a performance by Britney Spears, and then, of course, who hasn't been. And as a result, the admonition of the memo was that the NFL wanted to make sure that CBS understood that it was to be careful. The comments about Janet Jackson weren't expressing a concern about Janet Jackson. The Tagliabue memo itself says, I wouldn't know Janet Jackson if she walked in the room. It wasn't warning CBS about Janet Jackson. It was simply saying, take care. But one thing you need to anticipate with these performers who are trying to make a splash and a name for themselves is they do things that get them some notoriety. And I think if you follow up on that memo and the subsequent exchanges in the record, it shows that CBS considered a number of other performers and specifically rejected them. And, in fact, it went to the head of the network in CBS, where certain performers were specifically not selected for the Super Bowl because there was concern that they might not adhere to broadcast standards, and they couldn't be sure that they might not adhere. And that's one of the reasons why Janet Jackson was selected. It's also that the follow-up exchanges and sort of the planning process also showed the thinking of the network in instituting the delay. There was a debate back and forth about whether there was a need to, and ultimately the network decided to take the prudent course and adopt a delay because that was something that they felt was necessary to make sure that they adhered to standards. So the respondent superior theory in this case doesn't seem to me to fit accurately. It's helpful. But I think you'd make a very good argument that these performers were independent contractors. And so even assuming we find that the FCC acted arbitrarily and capriciously and finding to the contrary, you still say, it still seems to me that the FCC would be able to hold you to some degree of control, some degree of responsibility. And as I understand it, you're satisfied to being held at least to a reckless disregard standard of culpability. Am I stating it correctly? Well, I think as a constitutional minimum, it would have to be reckless disregard under the Bose standard and under New York Times v. Sullivan. But I think here, where you have a record that shows that CBS had absolutely no knowledge and given the Supreme Court decisions in cases like Smith v. California, given this context, I think it would be more appropriate to look for actual knowledge. But again, I think the minimum standard would be reckless disregard. Could you comment on the fact that this is a civil statute which incorporates a willingness requirement rather than a criminal statute, which more often requires the prior knowledge standard? Well, yes. The FCC has tried to make a great deal of the fact that this is a civil sanction. But of course, Pacifica, which they rely on, doesn't say that there's a difference in the Sienta requirement because of a civil versus a criminal penalty. It simply says that Section 1464 can be enforced either through criminal means or civil means. But there are other cases that speak specifically to that point. In fact, the Supreme Court decision in Manual Enterprises v. Day raised that very question with respect to regulations of the Post Office Department about determining whether or not matter was non-mailable for being indecent. And in that case, the Supreme Court specifically said that it makes no difference whether or not you're talking about a civil sanction or a criminal sanction. You would still have to constitutionally have a standard of Sienta so that you could impose liability only under that circumstance. Willfulness, as interpreted by the FCC, seems to present a very low bar. Do you think you'd be able to meet the bar? Well, I think the willfulness standard is no standard at all, as the FCC has articulated. And for that reason, it's inappropriate. But even if it were to apply, I think the actions that CBS took on this record show that it was not being consciously indifferent to a possible risk. What the FCC has tried to impose is essentially a race-ipsilocator standard, which puts the burden on the FCC to show why it couldn't have presented the unforeseen. Here, I just don't think that the FCC has justified that level of burden or that CBS failed to meet it. The FCC wants to draw a distinction between words and images in terms of the need for a rationale for changing policy. Is there a distinction between the type of words that are prescribed versus images? There's no distinction in any FCC decision that they can name. In fact, that's why the FCC had to reach out to Third Circuit cases and try to quote dictum from cases that suggested that was true. Those cases, as we showed in our brief, are inappropriate and don't reach the conclusions that the FCC says that they do. In fact, the FCC's decisions have never drawn a distinction between words and images. They've treated all potential indecency violations as the same under the restrained policy. In fact, the very first FCC decision that was issued after Pacifica in 1978 involved images of nudity, both on the Monty Python show and on certain other broadcasts that were on WGBH. Nevertheless, the FCC explained that it had to apply the restrained policy that was articulated in Pacifica. The same is true in cases that happened after that in 1988. Was there a policy change in young broadcasting with respect to fleeting images of nudity? No, there wasn't. As a matter of fact, the FCC did not try to explain that as any kind of policy change. It simply tried to say that this was its understanding of how it could proceed. In fact, that case is really quite different factually because the FCC tried to frame that as a case showing intent, where a broadcaster consciously brought in nude performers into a newscast and then goaded them into doing something that it thought was indecent. What's interesting about young broadcasting is that the licensee in that case filed a detailed opposition to the commission's notice of apparent liability, and this has been sitting at the commission for over two and a half years with no answer. That makes this case very analogous to the Golden Globes case, where the FCC actually did announce a policy change in Golden Globes and then refused to act on petitions for reconsideration and yet nevertheless applied that policy in subsequent cases. Those were the cases that the Second Circuit reversed in the Fox television station case, and the same result would be justified here. Does that mean that the prosecution of this case was an extension of existing policy, or did this represent a brand-new FCC policy? The commission has been ambiguous on that. I think that it's a manifestation of a new policy. The FCC tries to explain that it's a continuation of a previous policy, and yet is never able to fully explain those previous FCC cases that have dismissed complaints based on fleeting nudity. Did they say it's the same policy, or did they draw the distinction that I mentioned before between, oh, this is images, not words, so therefore it is different, it's not a change from our fleeting words policy? The commission draws that distinction at pages 25 and 26 of its brief, but it has never shown an FCC decision in the past that has drawn that distinction. There's not one. I'm sorry. If we agree with you on that point, then I guess your argument is they've provided no reasoned explanation for the change, so broadcasters have not been put on notice that the fleeting images policy has been changed. That's right, and for that reason, the reasoning in Fox television stations would apply directly to the situation here. That's at a minimum. It also raises, for the reasons that we explained in our brief, constitutional tensions with how the FCC is applying the law. If we were to agree with you on that new policy point, does that mean we can stop there, or do we have to address other issues? Well, certainly it could be remanded to the commission to determine whether or not a new policy is justified, but with one important device. But you would win on that point alone, wouldn't you? Yes. Yes, that's true. And if it were to be remanded on that basis, it would be important to note that the FCC would not have the authority to impose a forfeiture, both because it would be retroactive to whatever new policy they articulate. But couldn't they then give a reasoned explanation as to the change in policy and come down the same way? But in every other case in which the FCC has announced a new policy, it has explained that it cannot at the same time impose a forfeiture. And that's been true in the 1987 decision for what the FCC called its generic policy. It was true in the Golden Globe decision, and most recently in the 2006 remand order. I understood it as a matter of equity or fairness. At least that was the initial concept that it would be inequitable to impose. So they would have to change, have to explain away how somehow the equities had shifted such that now it could be imposed. That's right. And I also think basic due process considerations would apply. What's the procedural posture of the Fox case on the Second Circuit? It has been remanded to the FCC. The FCC has yet to begin that remand. But no petition for rehearing. The FCC did not seek rehearing. And no petition for cert. They sought and received a 30-day extension for the time to file a petition for certiorari. Do you take issue with the FCC's conclusion that the display, the image display here was indecent? I would take issue in two ways. First, I think given the nature of the display, that it's not actionably indecent, even if as a matter of substance you might consider it to be indecent because of the nature of the display, it's not actionable. But secondly, I think as well, the FCC's articulation and application of its contextual factors is arbitrary and incorrect. And for that reason, I would also take issue with it. What's wrong with the factors? I mean, any time you have three factors and you have to weigh and balance, it does get a little mushy. But do you have a better way for the FCC to proceed? I mean, they do have a mandate to regulate. Well, that's true. But the way in which the FCC has given weight to those factors gives a whole new meaning to the term mushy. They find it in their province to disregard certain factors, to recalibrate others, not even between cases but even in the same case. In this case, for example, they reevaluated how they view the three factors at least twice on each of the factors. I think there is a better way to do that, and they're based on the contextual factors that the Supreme Court focused on in Pacifica, which I mentioned earlier, whether or not something is prerecorded, whether or not it was intentionally broadcast, and whether or not it's repeated. Those were the contextual factors that the Supreme Court was concerned with. These three factors were ones that the FCC concocted in a policy statement in 2001 that has never been approved by the courts. Well, I guess we could argue all day as to whether the 916th of the 2nd here was graphic or explicit. We're going to have to define those terms. But I'm more concerned about the third factor, which talks about community standards and the way in which you would propose that the FCC arrives at those community standards. I mean, is this a matter of taking polls? How is the FCC supposed to do that as far as you're concerned? Well, for starters, the FCC could at least try to do some evidence of what the community standards are. Here, they've eschewed even the obligation to do that. They think that the five commissioners just know what the community standards are. And yet, as the brief filed by the amici, former FCC officials said, this is not something within the province of agency expertise, and in any event, the FCC has not demonstrated any expertise in this area. Well, how would they go about doing that? I think the best guidance we have is from the D.C. Circuit decision in the Illinois Citizens Committee for Broadcasting, where in the supplemental opinion of Judge Leventhal, he said that however hard it may be for the FCC to determine what a national community standard is, they at least have to make an attempt to discern what the national community would be and to try and find some level of consensus. That would entail providing some evidence of what the national community considers to be offensive, rather than just the sensibilities of the five commissioners. But these proceedings don't lend themselves to evidentiary matters, do they, and evidentiary findings. I mean, what happened here was CBS proffered, what, 70 affidavits or interviews, and it made its own record. But there's really no hearings where evidence can be provided, are there? Well, I'm not suggesting that there should have been a hearing in this case. Well, then you're complaining it's lacking due process, because they take some evidence of community standards and don't give you an opportunity to object. There could have been a hearing. I mean, certainly the FCC has that option. But that's not what they did, and that's not what I'm suggesting. What I am saying is that where evidence is provided that is separate from just what the commissioners are thinking, that the FCC has an obligation to consider it anyway and make that part of its decision, rather than simply saying we don't need evidence. Although we make those types of decisions all the time in looking, for instance, at qualified immunity, what a reasonable police officer would view as excessive force, or what knowledge of the law a reasonable police officer would have. I mean, people have to make decisions based upon general common sense or understanding of society. And why are the commissioners not able to do that? They've been appointed for that purpose in order to make some determinations. Why can't they be making that on a common-sense basis? Well, just as other FCC decisions require some basis in evidence, I think this should be reviewed as an original matter by this court whether or not the FCC had evidence here. Are complaints that are made to them helpful? They're helpful in indicating what the complaints have been, but they don't tell you whether or not something is reasonable. Often come from the same groups or same individuals as well. Well, yeah, as the record shows. I mean, the vast majority of complaints here were simply engineered by activist groups. And, in fact, many of the complaints in the record were duplicates. Twenty percent of the complaints were duplicates. Some complaints were duplicated in the record 37 times. In fact, the FCC says repeatedly on its website in its annual tallies of complaints that a complaint, and the fact that a complaint has been filed, is not to be taken as an indication that the law has been violated. And so the complaint counts really don't tell you what the community says. And, in fact, the FCC has said in this case that it didn't intend for the complaints to be taken as an indication of community standards. Prior to this case, are you aware that the FCC has used the respondeat superior theory of liability? It has used that in certain of its decisions, but never in a case involving this kind of content control in the indecency cases. You know, certain of its cases involving technical rules or where station employees or control of operations. Yes. All right, rather than content. That's right. Given, you know, just back on the community standards issue, given that the FCC has a mandate to regulate, is it entitled to deference in determining what community standards are? No, I don't think it is. As I think indicated in the Boe's decision, the commission's decision should be reviewed thoroughly by this court and both the factual records and the findings of law to determine whether or not it's consistent with the First Amendment. This case articulated that standard in U.S. versus various articles and merchandise schedule number 287, where it said that it's important for the reviewing court to make its own determination to ensure that the First Amendment standards are upheld. Thank you. Thank you very much. We'll hear now from Mr. Miller from the FCC, and we'll be happy to give you some additional time as well. Thank you, Your Honor. May it please the court. At the culmination of the 2004 Super Bowl halftime show, CBS broadcast the spectacle of a man singing I'm going to have you naked by the end of this song, while simultaneously grabbing a woman, ripping apart her clothing, and exposing her breast to the largest television audience of any broadcast that year. The FCC reasonably determined that that broadcast violated the longstanding federal prohibition on the broadcast of indecent material at times of the day when children are likely to be in the viewing audience. The commission also reasonably determined that CBS had acted willfully, thus making it liable for monetary forfeiture. I'd like first to address the question of whether the broadcast was indecent. The FCC analyzed that using its longstanding three-factor test, which looks at whether the material was graphic or explicit, whether it was dwelled upon or repeated, and whether it was presented in a pandering or titillating manner, and whether it was shocking. The FCC has explained repeatedly that all of those factors are to be weighed and balanced against each other, and no single factor is dispositive. Here, the material was graphic and explicit, and the commission found, as a factual matter, that it was clear and recognizable to the average viewer. The performers were at the center of the stage. They were the headline performers. Mr. Timberlake's hand motion drew the viewer's attention in, and if there were any doubt, Mr. Timberlake provided an explanatory narrative of exactly what he was doing. He said, I'm going to get you naked by the end of this song, and that's what he did. The commission acknowledged that the material was fleeting, but it found that that factor was outweighed by the graphic and explicit nature of it and by the shock value of it, and that's illustrated by the manner in which it was presented, taking account of the full context, its placement at the end of this highly sexualized performance with Mr. Timberlake's comments, the fact that it took place during the Super Bowl, which was marketed as family entertainment, contained no warnings that it might have content that was unsuitable for children, and was viewed by an average of 100 million people during the broadcast. And it's also confirmed by the statement of Viacom's president, that he was shocked and appalled by the broadcast, and we're not relying on that as a legal concession. I think it's one piece of evidence that, indeed, this is clearly something that was shocking. Now, the principal response that CBS makes to all of this is to say that there was somehow an exception under prior FCC policy that fleeting nudity could not be actionably indecent. It's no accident that they haven't identified a single case in which the FCC actually said that, because there isn't one, and it flies in the face of the language that the FCC used in the 2001 industry guidance in explaining how the indecency test works. It said no single factor is generally dispositive, and even, rather, all three factors have to be weighed against each other. And even in the context of spoken references and words, which, as we explained in our brief, are not properly analogized to nudity, but even in that context, there was an exception for fleeting expletives, but the commission also said that even relatively fleeting spoken references may be found indecent if other factors contribute to a finding of patent defensiveness. The idea of an exception for all fleeting nudity also flies in the face of common sense, because the rule that they're essentially saying had existed would be one under which broadcasters were free to broadcast any image at any time of day, no matter how graphic or explicit or offensive, so long as they did so briefly. And that is something that the commission has never held, and in particular in the WGBH case that petitioners cite, that was a license revocation proceeding, or a complainant had asked the commission not to renew a broadcast license, which is a drastic step. The commission has never done that because of an indecency violation. It's sort of the nuclear option of indecency enforcement. And the complainant had presented a five-page laundry list of complaints about various programs that were aired, and they mentioned nudity a couple of times. The commission's order does not discuss nudity at all. Nothing in the order gives any indication of whether a petitioner or the complainant in that case was even correct that there was nudity. And there is certainly nothing in the order that says, well, there was nudity, but it was fleeting, and therefore we're going to find it not indecent. The commission also reasonably determined that the violation in this case was willful, and there are alternative grounds for that determination. The first is respondeat superior. The commission found that the performers in this case acted willfully, and CBS seems to concede that that's correct. Before we get into the definition of willful, we're very interested in what you have to say about that. With respect to the fact you claim that there was no case that in effect validated the fleeting images or fleeting words policy, but as I understand it, the argument of CBS is that for nearly 30 years, the FCC followed a practice that was demonstrated in the orders that they issued and the declinations to go ahead, that in effect put everyone on notice that there was such a policy. Is that incorrect? It is incorrect simply because they haven't identified any cases that involved fleeting nudity. So there was nothing that the commission could have done to establish such a practice. It's not a surprise, by the way, that there has been a dearth of cases involving nudity, because I think there's been a recognition by broadcasters that that's material that's beyond the pale for broadcast television. But the policy was, regarding fleeting words, that these were not sanctionable. Is that not correct? That was a policy with respect to cases relying solely on the use of expletives. There was not a policy that all short utterances were exempt, and the evidence of that is paragraph 19 of the 2001 industry guidance, which gives three examples of spoken statements that were found to be indecent, and they're all just a sentence or two. And even though they were very short, there were factors about those statements that made them highly offensive, and therefore they were found indecent. So I think that is the decisive reputation of the claim. Even if one thinks that the words cases and the nudity cases are to be analogized, I think those three examples in the 2001 industry guidance prove that there was not an exception for all short spoken statements. Where are they in your brief, if you know? We do not give those three examples. We cite the 2001 industry guidance in the portion of our brief that addresses CBS's claim. Because I thought your argument was drawing a distinction between words and images. Well, that is also our position, and I think that's supported by common sense. I mean, if a person is walking down the street and hears someone swearing, you might be annoyed or perhaps offended. If someone exposes himself to you, I think the reaction would be quite different, even if the exposure is very brief. And I think that reflects the common sense idea that there is simply a difference in kind between nudity and spoken vulgarities. But yet, if the concept of indecent, as you've outlined it, includes graphic and explicit, it seems that the objection is as to the image that is conjured up with a word. And in fact, some of the words that are objectionable have been found to relate to specific items that do come to mind as a picture. How are words that conjure up images different from the images themselves? Well, certainly it is true that words have been found to be indecent and on that rationale. And I won't say the words or else I'll have a problem here. Sure, but there is still, I think, as a matter of ordinary understanding, a distinction between the image itself and the word that describes the image. And that's what the commission recognized in this case. Is it your position that you've treated images differently from words on the fleeting indecency standard? Our position is that the only fleeting exception that ever existed was with respect to fleeting expletives. It was not an exception with respect to all fleeting spoken utterances. And the commission did not have occasion to address the relationship between fleeting words and fleeting images. But certainly there is nothing that the commission ever said that suggests that there should be an exception for fleeting images. And on the contrary, the commission's language in the 2001 industry guidance about the importance of a full contextual analysis, the importance of balancing all three factors and the fact that one factor is not dispositive is contrary to that. If petitioners' view of the law were correct, that 2001 policy statement should have been quite different. Instead of saying there are three factors to be balanced against each other, it should have said there is a threshold requirement that the material not be fleeting and then there are some other factors. That's the opposite of what it said. In reconsidering the original Pacifica order, the FCC acknowledged that in some cases, public events likely to produce offensive speech are covered live and there is no opportunity for journalistic editing. Whether it's images or words, isn't that the same problem we have here that there was no opportunity to edit what occurred? No, Your Honor. What the commission there was talking about was public events where there's no opportunity for journalistic editing. It's talking about news coverage of some live event. Is what happened here much different? This was an event that was live in the sense that it took place in real time, but it was entirely created by CBS. It was an entertainment show that CBS put on. They hired the people who were in it and they organized it. It wasn't like they were going out and filming something that existed independently of them, which sort of raises the sorts of concerns about journalism that the commission was getting at in the order that you described. Of course, it was an event that was deliberately concealed from CBS and MTV. How do you justify sanctioning CBS in circumstances where it had no prior knowledge that the event was going to take place and that was deliberately concealed from them? CBS had knowledge of the event in the sense that the performers were part of CBS for purposes of this event. The commission found, as a factual matter, and this court has held the existence of an agency relationship or an employment relationship is a question of fact, the commission found that for purposes of the halftime show, Ms. Jackson and Mr. Timberlake were CBS employees. It doesn't seem to make sense at all. It sounds like a conclusion that was made out of convenience. They really weren't employees of CBS, were they? They were. Under the restatement, this court has recognized the critical factor is the right of the employer to control, and here every factor, every aspect of the performance was controlled by CBS. CBS created the set. It scripted every word that was uttered in the performance. It made Ms. Jackson and Mr. Timberlake attend two rehearsals, and after each rehearsal it reviewed the performance and it said, do this, do that, don't do this. Of course, if you were to ask Jackson and Timberlake if at the time of the Super Bowl they were working for CBS, what do you think they would say? There's nothing in the record about that. Well, but you can't isolate just one factor of control or the right to control as making someone an employee. I mean, if I have a painter come to the house and he paints the house, and I say I want it painted blue and I want it painted here and I'm controlling what he does, he's my employee. I mean, there are a lot more aspects to it than that. That is certainly true, although as this court said in McCarthy, there are many cases in which control is the critical and determinative factor. But you can't have it both ways. You say they had control and then you fault them for not exerting control over these individuals. The test is the right to control. One can be a negligent employer and not exercise that right appropriately, but that doesn't mean that one is not an employer. And here, some of the factors that distinguish, I think, the painting example are the painter would most likely bring his own tools and his own paint and brushes and so forth. Here, CBS provided the set. It was in charge of the costume. Well, I provide the house. I mean, the set and the house are analogous, but he brings his paintbrush and Janet Jackson brought her costume and her boots and whatever else she had on. It was a costume that was reviewed by CBS and CBS had the right to make changes to the costume. Where else, Judge Sirica asked before, where else have you reached this sweeping conclusion as to employee status of performers who happen to be on a show or presented as part of a show? I'm not aware of a case in which the commission has made findings about the employee status of performers, but certainly there are many cases in which the commission has relied on a respondeat superior theory of liability. Indeed. On content or on operation? On both, I think, because... The cases that we saw were all involved in the operation of the station rather than content. If the broadcast licensee is a corporation, all liability is going to be vicarious liability because the corporation can only act through its agents or employees. So any time that you hold the licensee liable for something, it's going to be in some sense on a theory of vicarious liability. Yes. With your theory of respondeat superior, you end up with virtually a strict liability regime. And you even say in your brief that even if they're independent contractors, there's a non-delegable duty here that CBA has had so that whatever happened, they're responsible. Irrespective of whether or not they acted reasonably or whether it was reasonably foreseen. That's right. Now, we certainly don't concede that they did act reasonably. I understand that. But that is correct, and it's not strict liability. It's vicarious liability, and that is entirely consistent with the First Amendment. It seems like it's the same thing. Once you determine that the performer is an employee of the network, they're liable. That's right. And the reason that that's right is the Supreme Court's decision in Cantrell against Forest City Publishing Company, which we cite at page 38 of our brief, and that was a false light invasion of privacy action against a newspaper for printing an article about the plaintiff that contained some inaccuracies. And the reporter had actual knowledge of the inaccuracies so as to satisfy New York Times against Sullivan. But the Court of Appeals set aside a judgment against the newspaper, his employer, because it said the paper didn't know that the article was inaccurate. And the Supreme Court reversed that, and it said that it was applying, quote, traditional doctrines of respondeat superior, and that that was enough to hold the newspaper liable for the employee's knowledge, even though nobody else at the paper knew that the article was false. And so I think what that shows is that there is no First Amendment problem with vicarious liability. The First Amendment tells us under what circumstances can speech be subject to sanction. But once we know that speech can be sanctioned, then the question of where the sanction falls, whether it's the agent or the principal, that's governed by common law principles of agency, and the First Amendment doesn't speak to that question. Isn't it ill-advised as a policy because now you're going to have broadcasters not exerting control and maintaining a distance from performers, not trying to control their content, lest they be held to be vicariously liable? So as a policy matter, you're going to promote the non-regulation and non-control of performers of this kind. I mean, in the next iteration of this, CBS is going to have a total hands-off approach to these performers, lest they be held liable for what they do. I think there are two answers to that, Your Honor. The first is that, as we explained in our brief, there is a non-delegable duty that the licensee has that cannot be discharged simply by changing the relationship that it has with the person that it puts on the air. So even if it calls them an independent contractor, which is essentially the rule that CBS proposes, it can't avoid all liability or it shouldn't be able to avoid all liability for the performance. You have to satisfy the test of deliberate and conscious omission or commission by the licensee, the deliberate and conscious failure to comply, and you still have to meet the statutory standard, regardless of whether you want to impose a common law principle. Well, that's correct, but there's no dispute, I think, that Mr. Jackson and Mr. Timberlake have that standard. So the question is, can that be imputed to the commission, or can that be imputed to CBS, rather? So the First Amendment doesn't apply in this context? I think the First Amendment applies to figuring out when speech can be subject to sanction, but it does not displace the common law of agency, and that's what Ken Harrell tells us. So what about with obscenity? Would you say the same thing with respect to findings of obscenity? I think we would. I'm not aware of cases. Well, I mean, the court has said that cyanide is an aspect of finding culpability for obscenity, but you're saying it's not a finding of indecency if you have a respondeat superior situation. I think some of those cases are in the criminal context where the respondeat superior isn't available in the criminal context. But if I could just come back to the policy issue that you were raising, Judge Rendell, I think once under Cantrell the First Amendment is not involved in determining what the attribution rule will be, then there is a policy judgment that needs to be made. And it's a judgment between, on the one hand, saying that to the extent that there's an ability to control, we want to use respondeat superior to create an incentive for the employer to exercise that ability to control, or on the other hand, we could say, as the Supreme Court said in some of the Title VII cases cited by CBS, that maybe the policy would be better served by saying that an employee who has taken certain precautions is exempt from liability. But that balancing that the Court has done in the Title VII context, in this context, in the context of the interpretation of the Communications Act, that policy judgment is committed to the Commission in the first instance. And here the Commission has chosen to use the traditional common law principles of the law of agency. Let's talk about the standard here, the knowingly versus willfully, and where we come down in terms of the statutory provision here that allows the defined. Willfully, as you define it, requires a conscious and deliberate omission or commission. Is that not correct? Right. And tell me how you fit what happened here and what CBS did into the concept of conscious and deliberate. Well, I think at a certain point, indifference in the face of an obvious risk can constitute a deliberate omission. And I think I understood Petitioner's counsel to acknowledge that a moment ago, that willfulness can be met by a sufficient showing of recklessness. And here there's abundant evidence of that. But isn't that different from what you just said about, in effect, finding vicarious liability irrespective of any finding of gross negligence? They're not inconsistent. They're alternative grounds for liability. CBS is liable because Ms. Jackson and Mr. Timberlake acted willfully, and that willfulness is imputable to CBS. CBS is also independently liable because even at the managerial level, there was an indifference to the obvious risks that something like this might have happened. And I think even if the court is of the view that traditional respondeat superior is inappropriate, certainly it ought to be sufficient for liability when you have an agent who commits a deliberate act, coupled with the kind of evidence that we have here of deficiency in the supervision of that agent. And that evidence is... I was just going to ask, we're dealing with concepts here that have been construed by the courts, concepts deliberate and conscious. Where can we find authority for the proposition that indifference or even recklessness, because I'm not ready to concede that that fits, constitutes conscious and deliberate conduct? I mean, I understood that to be CBS's position. No, no. I mean, what authority in the case law? We've got to decide this as a court, not as, gee, sounds okay to me. Indifference, conscious, deliberate, you know, it fits. We've got to figure out what conscious and deliberate means. Where can I find in the case law authority for the proposition that indifference meets that test? I would refer you to the willful blindness cases. And we cite one in our brief, U.S. Against Leahy, that at a certain point, inaction in the face of just an obvious evidence that something may happen. But that's willful blindness. That's more than indifference. And I would venture that the FCC did not rely upon willful blindness. I know you have it in your brief, but that's not the concept that they embrace. They embrace conscious and deliberate as meaning willful. And yet I'm trying to find somewhere that I can hang my hat and say, okay, indifference is enough. Well, I mean, I think that, as I said, the clearest basis for liability here is the respondeat superior or non-delegable duty theory. And there's no need, really, to reach the question of what CBS did at the managerial level, because the commission's finding can be upheld on the basis of those other theories. And, again, even if you don't think that strict respondeat superior is appropriate, surely respondeat superior coupled with the evidence of indifference to risk. I think the implication of the First Amendment and the chilling effect of the penalty that you imposed in this case requires some standard of culpability that would be prior knowledge or fault for what occurred. It does, and we don't deny that. And the willfulness standard as defined in the statute requires knowledge or intent. The question, again, is just given that Mr. Jackson and Mr. Timberlake undisputably have the requisite intent, can that be imputed to CBS? Is it your position that CBS had prior knowledge of what was going to take place? Through Jackson and Timberlake, yes. At the managerial level, they were aware of serious risks, but they were not specifically aware that this would happen. Where do you draw the line on this control issue? Let's say David Letterman has Paris Hilton on as a guest, and obviously there's a contract for her appearance so that there is an arguable element of control here, and they review the questions ahead of time, and yet she says something unscripted. Is the network liable then for whatever she says? Is she an employee? Is there a respondeat superior issue there? It depends on the facts and circumstances of each case. In that case, I suspect probably not. I don't know, but I'm not under the impression that talk show guests are paid for being on the talk show. They're not told what the answers to the questions are supposed to be. They don't have to attend a rehearsal and have somebody correcting them on the answers and directing them what to do. Whether there's a rehearsal, I thought you said it was control, and it seemed to me if anytime there's a contract, there's the ability to control. And so anytime there's a contract, you could arguably say, well, they have the ability or the right to control because they're presenting this person. Everyone is going to be an employee, aren't they? No, because the contract, if there is a contract for being a guest on a talk show, which I don't know of, presumably does not say, like, and we have the right to tell you what your answers to the questions that Mr. Letterman asks you are going to be. That's up to the guest to say what they want. Is that what the contract provided here, that CBS could change the music and the language and tell them what to say? The evidence shows that it did do that with respect, for example, to Kid Rock, who had a song that referred to driving a brand-new Lexus, and they told him to delete that line because Cadillac was one of the sponsors of the Super Bowl. So they clearly did have the right to change what the words were. And the focus seemed to be more on him than on the other performers as perhaps being at greater risk. Is that correct? Well, there was also concern about Ms. Jackson, as shown in the memo from Paul Tagliabue that Judge Rendell referred to a moment ago. And I think it's critical that Mr. Tagliabue specifically connected his concerns about Jackson to the incident in which Britney Spears undressed on stage. So he was clearly aware of the risk of this kind of deviation from the script. Separately, the NFL, in an email, raised concerns about the line, I'm going to get you naked by the end of the song. Now, there's no reason to be concerned about those words. A performer would be no more likely to put profanity into that line than into any other. The reason you would be concerned about that line is because of the possibility that someone might act it out, just as Ms. Jackson did. There's also the evidence of the statement from Ms. Jackson's choreographer promising that the Super Bowl would have some shocking moments and saying, I don't think the Super Bowl has ever seen a performance like this. CBS claims that they thought that that referred to the appearance of Mr. Timberlake, which was announced in the on-screen credits ten minutes earlier. The commission appropriately found that to be not a plausible explanation. But that's evidence, for example, of a very simple step that CBS could have taken. They could have simply asked the choreographer, what do you mean, shocking moments? Are the precautions relevant given your theory of responding superior? In our view, no, but certainly... So it doesn't matter what CBS would have done to prevent what occurred. It's irrelevant because it, in fact, did occur. Under the common law, the employment status and the fact that Ms. Jackson intended it is sufficient for responding of superior liability. But if the court thinks that there has to be some additional factor, employment status plus some deficiency in supervision, then certainly the fact that they didn't ask the choreographer about the shocking moments, the fact that they didn't put anything in their contract requiring the performers to abide by broadcast standards, the fact that there's no evidence that they even informally told the performers about the broadcast standards, all of those facts are relevant to the analysis. What's your position on the video delay? The commission found at paragraph 20 of the forfeiture order and then in footnote 71 to paragraph 22 of the order on reconsideration that video delay was available and could have been used. It was used only one week later for the Grammy Awards, so it didn't require the invention of some new technology. They were able to put it in place for the Grammys using off-the-shelf equipment. What was the basis for that finding? What was the basis for the finding that video delay was available at the time of the Super Bowl broadcast? The fact that it was used only a week later for the Grammys. Is there anything else besides that? No, I think that's all. Nobody else had ever used video delay for an event such as this? That's correct. Any other questions? No. Mr. Miller, thank you very much. Thank you. Thank you. Mr. Kornrever, Mr. Miller mentioned the Cantrell case. Yes. He said that's really a good analogy for us to use where the newspaper publisher is responsible for what the publisher puts out. Why is that not the right analogy here? The Cantrell case doesn't speak to the same issue of respondeo superior that we've been describing. In that case, in fact, Joe Esterhaus, the reporter, was an employee of the newspaper. If the reporters for the newspaper don't create responsibility for the newspaper, then arguably our responsibility would never exist. The issue here is whether or not you might impute punitive sanctions where someone has taken good faith efforts to comply with the federal statute, and that was the issue addressed in Colstad v. The American Dental Association, which we cite in our reply brief. In fact, this goes specifically to the policy issues that Judge Rendell was asking about. The court looked at Section 217C of the restatement and said that where the employer has made a good faith effort to comply with the federal mandates, then you would not be able to apply punitive damages in that instance. It's not a First Amendment argument that the FCC is trying to use with the Cantrell case. Here, the issue is whether or not the doctrine of respondeo superior even applies in this circumstance. Here, what the FCC has done is tried to place at war the issues that it's raising about respondeo superior with the issues of willfulness. That is, the less willful FCC was in consciously ignoring the factors that may have led to risk at the Super Bowl, the more it's responsible for respondeo superior, the more control it exerted to try and prevent any untoward events at the broadcast, the more it's responsible under respondeo superior. It's purely a heads-I-win, tails-you-lose argument. As a result, the application of respondeo superior simply doesn't pertain in this case. For the same reasons, the argument about willfulness is incorrect as well. I think the record is quite clear that CBS did everything that a reasonable broadcaster could do to anticipate the event and try and take measures to not allow it to happen. But should they not have put into the contract a provision that the performer would comply with broadcast standards and maybe even pass along, I don't know if this violates public policy, but pass along to the performer the obligation to pay any fine imposed if the performer doesn't comply with that? Well, I'm not certain that indemnification would have done much good in this circumstance. It might have been a disincentive. What did exist in the contracts, and the FCC overlooks this, in both the Janet Jackson and Justin Timberlake contracts, were the obligation to appear at the dress rehearsals where standards and practices personnel were there to give specific program notes, to inspect the costumes, and so on. I'm trying to imagine a circumstance where Janet Jackson and Justin Timberlake would be poring over legal documents and trying to determine whether or not they're meeting FCC standards, as the FCC suggests should have been required by the contract. Instead, it was a more direct obligation in the contract to have them attend the performances where standards and practices gave them specific instruction. Was the provision that they would do nothing in the final performance different from what they did in the rehearsal? That assurance was given directly to the producer of the show by Janet Jackson's representatives in the after-rehearsal meetings about the program notes. Is that in the record? Yes, it is, and it's provided in the response to the FCC, as well as discussed in our briefs. The FCC takes the position on the question of the restrained enforcement costs of the FCC that if this court were to adopt the policy that the FCC had had for 30 years, that as a result broadcasters are going to go wild and are going to be able to present nudity at all times of the day or night. That is simply not true. As a matter of fact, the history of broadcasting shows that it's not. The safe harbor says that broadcasters can put on indecent material after 10 p.m., but historically they've never done that. This is a position that the Second Circuit described as divorced from reality. Secondarily, the FCC itself rejected that same argument in the Schindler's List case when it was made by a complainant who happens to be an amicus in support of the FCC in this case. But finally, I think it's important to make clear that this case is not just about the Super Bowl. This case goes to the zero-tolerance approach that the FCC has adopted since the Super Bowl decision and since 2004 that affects all broadcasting and all live broadcasting. Today, of all days, on September 11th, I think it's important to remember this fact, particularly since one year ago, 10 percent of CBS – or 20 percent of CBS affiliates covering 10 percent of households in the United States – declined to run the documentary on 9-11 in real time because they were concerned about the language that some of the emergency personnel and firefighters were using. The only thing that had changed in the time that it had run initially and when it was attempted to run on the fifth anniversary of 9-11 was the change in the FCC's policy. These changes have had a profound sensorial effect and for that reason should be reversed. What is the remedy that you are seeking in light of that policy? Well, we're seeking reversal of the FCC's decision. Whether the court chooses to remand so that they can take a crack at refining some policy, dealing with fleeting images, they – you know, that's one option. If that happens, as I mentioned before, I don't think it would be possible to impose a forfeiture after the fact for the reasons that we stated, because there was lack of intent and also because it would be retroactive. Let me go back to the respondeat superior theory again. Assuming we basically agree with your position, that still leaves you potentially culpable on the basis that you did not act reasonably on something that should have been foreseen, why would we not defer under the arbitrary and capricious standard to what the FCC found? I think for a couple of reasons. One is I think in the First Amendment context, the reviewing court looks at the record independently to determine whether or not that decision would have First Amendment intention and First Amendment implications. And I think in this case, the court's review will show that the record is clear, that CBS took every action that a responsible broadcaster could take. Beyond that, the standard, the threshold for what the FCC wants to set for what a reasonable broadcaster would do is simply incorrect. Past decisions both by the FCC and reviewing courts have said that you don't have to satisfy every conceivable, every possible outcome that can happen. Instead, you take those actions that are reasonable. And those courts have also, the D.C. Circuit in particular, have recognized that that context is different in the case of a live broadcast. And in the example that Judge Flint has mentioned earlier in the reconsideration order in Pacifica, the FCC itself said that where you have a live event and no opportunity for journalistic editing, you would not impose that kind of culpability, that kind of liability on a licensee. I think the same standard applies here. Any other questions? Good. Mr. Korn Revere and Mr. Miller, thank you very much for an excellent argument. We will take the case under advisement, and we will certainly prepare a transcript of the argument as we deliberate on this matter. And I would ask the parties to share the cost of the transcript for us. Good. We'll take a short recess. Please rise. Court stands in recess. Thank you, Mr. Chairman.